**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

FRANK GREEN,

                       Plaintiff,

v.

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, ROBERT EADICICCO, TONY
CARVAGNO, NICHOLAS MIRCOVICH, LELA
MARTIN, COTEA JONES, LAURIE PRICE, AND
TOMMY SMITH
                       Defendants.

Civil Action No. 07-3910(KSH)

**OPINION**

**KATHARINE S. HAYDEN, U.S.D.J.**

## I.  Introduction

Plaintiff Frank Green has sued his employer, The Port Authority of New York and New Jersey ("Port Authority"), and individuals who are employed there – Robert Eadicicco, Tony Carvagno, Nicholas Mircovich, Lela Martin, Cotea Jones, Laurie Price, and Tommy Smith – on grounds that his civil rights were violated.  Specifically, Green alleges that the Port Authority and the individual defendants: (1) created a hostile work environment for him based on his gender; (2) retaliated against him for his complaints to Port Authority administration about on-site gambling by other Port Authority employees; and (3) retaliated against him for his complaints of sexual harassment against his supervisor.  Finally, Green asserts state-law claims for negligent and intentional infliction of emotional distress based on the above conduct.  The Port Authority now moves for summary judgment.  It appears that Green has conceded that "the Third Circuit is not persuaded that Congress intended to hold individual employees liable under

1

Title VII" (Pl. Br. 18.), *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996). The Court dismisses the individual defendants.

## II.   Statement of Facts

Initially, the Court notes the Port Authority's argument in its Reply Brief [D.E. 36] that plaintiff's opposition brief [D.E. 35] fails to conform to the Local Rules of Court. The Port Authority is correct that the section entitled "Facts" is not organized in the useful manner the rules require. Green's amended brief [D.E. 37], which merely puts numbers in front of certain paragraphs, does not correct that problem. Notwithstanding, the Court has made a careful review of the record and is satisfied that its conclusions in this opinion are soundly based on what is, and what is not, established by the available record evidence.

Green has been employed by the Port Authority for the past 26 years. (Green Dep. 10:22-23.) He worked as a facility operations agent at the Lincoln Tunnel from 1981 to 1986 until he became a Tunnel and Bridge Agent ("TBA"). (*Id.* at 10:14-16.) He worked at the Holland Tunnel from 1986 to 2007, with a six-month sojourn at John F. Kennedy International Airport in 1988, before returning to work at the Lincoln Tunnel in October 2007, where, it appears, he continues to be employed. (*Id.* at 11:24-13:19, 21:4-15.)

In or about September 2001, Green began working under Lela Martin, a group supervisor at the Holland Tunnel. (*Id.* at 33:3-34:10.) TBAs and group supervisors interact with each other there on a daily basis. (*Id.* at 37:7-11.) According to Green, Martin interacted with him normally for nearly the first three years of his employment. (*Id.* at 40:3-6.) Then, he testified, during the summer of 2004, she "made advances" towards him. (*Id.*) According to paragraph 14 of his complaint, Martin's advances went on for about three months.

Green testified in his deposition about Martin's conduct and appearance thus:

A:  A lot of times she would summon me to her office to perform a detail, and as I entered the office she would be seated behind the desk and have her blouse open showing her breasts, and basically asking me if I wanted coffee.

. . .

Q:  And are you indicating that there was something unusual or out of the ordinary for a supervisor to call a TBA to their office?  That's not what you are implying, correct?

A: No, no.

Q: Second thing, when you say she had her blouse open.

A: Yes.

Q: Are you saying that she had her blouse open, totally exposing her breasts?

A: I would say, yes you know, like open, out.

Q: Are you saying to me that her blouse was open?

. . .

Q:  Such that when you came into the office her breasts and her bra and everything else was exposed to you, is that what you're implying?

A:  What she would be wearing is like a blouse, but it could be a push-up bra, you can't see, but the way she opened up her blouse is that you can see, that's the first thing you see.

. . .

Q:  Let me ask you this.  Was the attire, the blouse that you just described –

A:  Right.

Q:  – something that she wore during the entire day that she was there in the office for other people to observe?

A:  Yes.

Q:  So when she arrived at work that day or when you first saw her, did she have on the same blouse which you just described, which I believe you have indicated is very revealing?

A:  Right, normally, if she is going about her business it would be, you know, well, closed and she would have a sweater or jacket, you know, not . . .

Q:  But when she saw you, she exposed it more, is that what you are suggesting?

A:  Yes, yes.  Basically she took off her jacket and just opened up her blouse.

Q:  When you say, "Opened up her blouse," what I'm trying to discern is whether or not you have indicated that she unbuttoned and disrobed; is that what you are suggesting?

A: No, no.

Q:  You are suggesting that what she wore is a blouse that was very revealing, would that be fair to say?

. . .

A:  You can – a woman can wear a blouse and have it buttoned or covered by a sweater and of course change it – the appearance, by loosening it up and just basically making it, making herself more revealing.

Q:  Well, let's talk about that.

A:  Mm-hmm.

Q:  She called you into her office, correct?

3

A:  Yes.

Q:  Was she seated when you came into her office?

A:  She was seated.

Q:  Did you see her at the facility at any time before you came into her office?

A:  During role [sic] call.

Q:  And during role call, did her appearance change from the time that the role call was conducted to the time that you came into her office to sit down?

A:  Yes.

Q:  And how did it change?

A:  If she is wearing a sweater, it would be buttoned and, of course, if she is wearing a blouse it would be buttoned, you know, everything would be, you know, covered, you know.

Q:  And when you came to her office, she didn't have it – she was not covered, is that what you are testifying?

A:  Yes.

Q:  And you are surmising that that might not have anything to do with the temperature in the room or a comfort situation, you have concluded that that was because she was attempting to reveal herself to you; is that your testimony?

A:  Yes.

Q:  Did you ever see Ms. Martin walk outside of her office without a sweater or a jacket.

A:  Yes.  I mean she had worn other clothing that, you know, everybody dresses different every day but.

Q:  So other than your conclusion that she wore or changed her clothing when she called you into her office, is there anything else that led you to the conclusion that she was attempting to, I believe you said, make advances towards you?

A:  She did approach me and ask me about the different places I hanged out, you know social venues, the time I would go there, and she kind of indicated it like she was kind of interest in some of the places that I did go.  She always complimented me on my physical appearance, in terms of the way I wear my hair.  At the time I was wearing – I had a perm, I had long hair going down to my shoulders.  So she would – constantly complimented me on the way I took care of my hair and my manner of dress.  That she had noticed me for quite a long time.  So in terms of my civilian wear she was very interested in, you know, how I looked in it.

Q:  And other than those statements, was there anything else that she said that caused you to come to the conclusions that she –

A:  Quite a few times, if I'm in the garage and I'm by myself, you know, she would come up behind me and kind of rub against me.  And say, I remember one morning it was – it was cool morning, and she came up behind me and turned around and faced me and mentioned that I should be wearing a sweater or something because it was kind of cool, you know, and I shouldn't be walking around without a jacket I might catch a cold or something.

Q:  And you took that as an advance; is that what you are telling me?

4

A:  Yes, because the way she kind of came up behind me and brushed against me, and then turned around and faced me.  You know, like we was [sic] seeing eye to eye, you know.

. . .

Q:  Let me ask you this, Mr. Green, did you ever say to her, leave me alone, I'm not interested in you?

A:  Basically, the only time I would say I was – I did [not] want to be bothered is because I had work to do, that's the way it ended.  If she came around me, I just say I have to take care of whatever I have to take care of.

Q:  Well –

A:  I mean – I didn't – that's the way I would end it.

. . .

A:  I didn't say, leave me alone.  I basically walked away from her.  I said, I have work to do, and I walked away from her.

Q:  You never said Lela, I'm not interested in you, leave me alone.  You never said anything that direct?

A:  No.  I never said anything direct like that.

Q:  Is it also true that she never said anything to you in a direct manner, such that she was interested in going out with you or having a relationship with you?  You have concluded based upon her actions that she made advances towards you; would that be fair to say?

A:  Yes.  She has made advances towards me.  But she didn't come out directly and say that she waned [sic] to be with me, that, no.

(Green Dep. 40:15-19, 40:25-41:14, 41:19-25, 42:14-46-22, 47:2-18, 50:13-50:5.)

In her deposition, Martin testified about those interactions with Green:

Q:  Did you ever have a conversation with Mr. Green discussing how he dressed?

A:  A conversation with him?  I recall complimenting him on his attire maybe once but not complimenting him, I remember paying him a compliment on one occasion.

Q:  And what was that compliment?

A:  If I had to guess, he was out of uniform and I told him he looked nice.

Q:  And where were you when you made this, this compliment?

A:  I believe I was at the desk of, the communications desk, if I remember correctly.

Q:  Did you ever ask him where he hangs out during non-working hours?

A:  There was an occasion that I mentioned to Frank, I recalled seeing him at a place in Brooklyn when I was not a PA employee.  I had a déjà vu moment, like I knew him from somewhere before and I asked Frank, did you ever go to a place? I couldn't remember the place but it is the Dean Street Café which is a club in Brooklyn and asked Frank did he ever go to the Dean Street Café.  I said I knew it, I seen you there before when I wasn't a PA employee.  This was years before. There was this conversation and this was during, my supervisor at one time on the job when I kind of recalled seeing Frank.  I had a déjà vu moment because he was wearing the cowboy hat with a particular attire, his cowboy hat, his attire and that

is when I recalled having seen him at the Dean Street Café so I asked him did he
frequent that club.  He said yes.  I said I knew it, I seen you there before.  I was
not a Port Authority employee when I saw him there.
Q:  So –
A:  And then I asked him did he frequent that club.  He said yes and that was the
end of any conversation that was where Frank spent his time when he's not at
work.
Q:  The same cowboy hat?
A:  I don't remember if that was the same type.  I don't remember.  It may have
been because I remember the hat of the cowboy and I think [that] it was a
compliment.  He had a cowboy and I want to say I got up and compliment him
and I remembered that from the Dean Street Café.  That was the connection I
made.
Q:  And was it 16 years ago, that connection that you made?
A:  I wasn't a PA employee.  That's all I recall.  When I was at that Dean Street
café, I wasn't a PA employee.  That is the nature of the conversation and that was
where it began and that was where it ended in my mind.  In his mind, I'm not too
sure.
Q:  Why is that?
A:  Because it seems like that comment, Frank is somewhere else [, thinking] that
I became attracted to him and hitting on him and all this other stuff that is
unbeknownst to me.

(Martin Dep. 15:10-17:22.)

According to Green, since he did not return Martin's advances, she began giving him

unpleasant work assignments and "making [his] life miserable."  (Green Dep. 58:10-15.)  In his

complaint, Green alleges that Martin "began calling him over the [Port Authority's] radio

numerous times a day asking for his location"; that she "would call him to respond to alleged

disabled vehicles and obstacles in the roadway that did not exist";  and that she "would [] alter

[his] work schedule to benefit other coworkers and to agitate [him]."  (Compl. ¶ 17.)  Martin

acknowledged that Green complained to others that she would single him out and assign him to

wash Port Authority vehicles even though he was on excess roll call position, i.e., when there

were extra men on the schedule.  (Martin Dep. 20:3-23.).

In his complaint, Green alleges that during the period of July 2004 through September

2004 he complained to Cotea Jones, Martin's direct supervisor, that Martin mistreated him

because he was not interested in her advances.  (Compl. ¶ 18.)  In his deposition, Green did not specify what his first complaint to Jones entailed; however, Jones stated in her deposition that Green objected to Martin watching him on camera during his details.  (Green Dep. 89:2-12; Jones Dep. 17:9-21.)  Jones testified that she told Green, "That's her job.  She has a right to watch all the employee[s] because she needs to know where they are at all times."  (Jones Dep. 17:9-21.)  Green testified that he made his second complaint to Jones in a group discussion with Jones, Martin, and shop steward Joey DiBenedetto.  (Green Dep. 89:2-12.)  According to Green, at that meeting, Jones "kind of laughed everything off" and it was "obvious to [her] as well as other coworkers that Lela Martin was basically harassing me openly."  (Green Dep. 89:14-21.)  At the conclusion of their conversation, Green testified that Jones turned to him and said, "I know that Lela Martin likes you [so] why don't you do her and get it over with."  (*Id.* at 89:20-24.)

In her deposition testimony, Jones denied discussing Martin's alleged sexual advances at any point during the meeting.  (Jones Dep. 24:6-25:5.)  According to Jones, they only discussed Green's continued complaint that Martin "watches him on the camera," and at no point did she ever state that Martin was harassing him.  (*Id.*)  Jones testified that Green's assertion that she told him to "do" Martin is "absolutely a boldfaced lie."  (*Id.* at 30:3-9.)  Jones testified that, on another day, Green mentioned that Martin "commented about a nice shirt that he had on," to which Jones recalled responding, "Well maybe she likes your shirt."  (*Id.* at 27:11-14.).  Jones further testified, "Now, I don't know how he translates that to 'Go ahead and do her,' but, like I said, that was the conversation."  (*Id.* at 27:14-16.).

On August 2, 2005, an altercation between Green and some of his co-workers occurred at a Port Authority garage in New Jersey.  (Green Dep. 51:6-10.)  One of Green's co-workers, crew

chief James Watson, informed him that a call had come in over the Port Authority radio instructing him to report to a section of the Holland Tunnel for assignment. Martin and two of Green's other superiors, Anthony Carvagno and Robert Eadicicco, were waiting there.  (*Id.* at 52:1-19.)  Green responded that he was on lunch break and that Martin "should know better than to call" at that time.  (*Id.* at 52:8-15.)  Further, he stated to Watson that Phil Monde, another TBA, was at the scene and she should have called him instead.  (*Id.*)  According to Green, Watson agreed with him and advised that he should promptly respond at 11 a.m. when his break ended.  (*Id.* at 52:16-20.)  At that point, Monde entered the room and informed Green that Martin wanted him to report to duty.  (*Id.*)  In his deposition, Green stated that Monde ordered him to report to duty immediately (*Id.* at 52:16-20), whereas Martin recalled that her instructions were that he should begin his assignment detail at 11 a.m., after his break ended.  (Martin Dep. 72:22-24.)

Green told Monde that he was on break and that he would follow Watson's instructions to continue his break.  (Green Dep. 53:1-10.)  Green and Monde argued for the next 15 minutes until 11 a.m., when according to Green, Monde cursed him and told him to get to work.  (*Id.*)  At that point, Martin reported to the garage and inquired about the argument.  (*Id.*)  Green testified that he was in "an upset state," and that he told Martin about his altercation with Monde in a "rather strong tone of voice."  (*Id.* at 53:1-25.)  In her deposition, Martin stated that Green's "behavior was crazy," and that he "yelled at me that . . . if I wanted him to do something I [should] tell him myself."  (Martin Dep. 73:22-74:19-20.)  Martin testified that she "had no choice" but to write Green up.  (*Id.* at 75:12-13.)

On August 11, 2005, Green was served with a Notice of Intent to Discipline.   (Green Dep. 54:18-25.)   Martin and Green each prepared Incident Reports detailing their respective versions of the story.   (Cert. of Joan Pinnock ("Pinnock Cert."), Exh. A.)

Martin's Incident Report described Green as acting "enraged."   "He was unable to refrain from pacing / rocking from side to side, his eyes were fiery and his very demeanor intimidating. . . ."   (*Id.*)   After providing further detail about interactions between Green and Monde and the intervention of Watson and another TBA, Martin concluded:

> It should be noted that this is the second occasion of a heated discussion between TBA Green and myself.   It is apparent that he has a problem controlling his temper, and his body language denotes a fighting stance (that was on both occasions).   As a Supervisor I don't feel I have to tolerate such abuse from staff that I supervise.   There is an issue of employee conduct that must be dealt with between TBA Green and myself.   I am beginning to feel threatened by his demeanor.   I have to second guess myself upon giving him any instructions, due to his allegations of favoritism, etc.   May this incident report serve as an appeal to Management that this is an explosive situation that is continuing to escalate, weekly.

(*Id.*)

In his Incident Report, submitted in response to Martin's document, Green reported that he was on his 10:00 a.m. to 11:00 a.m. meal break when Martin (referred to as " '9-5' Martin," which the Court assumes is a technical term since the "9-5" designation is applied to other individuals) radioed he was to report immediately.   Green described his interactions with Watson and his verbal altercation with Monde, and stated that after the belligerence had ended, Martin walked in and asked what happened, and the other TBAs "informed Martin of the nature of the argument."

> Despite their explanation, she still approached me with question [sic] and insisted that she did not encourage TBA Monde [sic] behavior.
>
> I believe that by sending a subordinate to retrieve me during my meal break after notifying the chief in charge construed a violation against my rights as a Port

9

Authority employee.  I believe "9-5" Martin should have reviewed the schedule sheet before she decided her next step.  The fact is that, it has been many occasions when I had felt that "9-5" Martin has gone out of her way to intimidate me and question my job performance with no reasons.  Over the twenty years that I have been employed by the Port Authority, I have never before encountered any situation in which neither my job performance nor my behavior has been subjected to any scrutiny by any other supervisor.  Operation supervisor Martin has done so in numerous occasions.  Her behavior toward me has been unusual and unfair; nevertheless, I have always treated her with the respect and courtesy that she deserves.  It is not of my nature to be abusive or to disrespect any type of authority.  In addition, I have always complied with her orders and the schedule that she provides.  Although, it is true that I have questioned her about last minutes [sic] changes done to my schedule, I have done so in a polite manner.

Furthermore, "9-5" Martin stated in her report that she came down to the garage at 11 am to find out why I did not respond to the call, the problem with her report is that at 11 am I had just returned from my meal break.  The fact is that she was aware of the argument that arose between TBA Monde and I [sic].  The argument was the product of her antagonistic behavior against me.  After she went through the proper channels, it [sic] was no need to send TBA Monde to procure me during my meal break.  Another discrepancy in "9-5" Martin [sic] incident report is that, if any time would had [sic] passed between the time of her call and her appearance in the garage at 11 a.m., it only would indicate that the call went on the air before 11 a.m. and, I was not supposed to answer.

The question is, how "9-5" Martin figured out that I was not responding to the call when it was only 11 a.m. as she alleges in her report.  For all she knew, I could have been in route to answer the call since it was only 11 a.m.  The discrepancies in her report are obvious and I really wish that this time things were taking [sic] care of.

I expect that this matter could be resolved in a way that everyone is satisfied with the outcomes.  Also, I hope that some type of provision is made if none existing [sic] to avoid this type of situation in the future.

(*Id.*)

On October 17, 2005, pursuant to Port Authority procedure, a hearing was conducted before an independent arbitrator, Elizabeth Gill.  Green was represented by union vice-president Peter Basile.  Gill's written "Findings and Decision" (McGahee Cert., Exh. 11), issued October 26, 2005, were as follows:

Careful review of the record, testimony and documents, show that Mr. Green was to report to the Provost Post Cut at 11 a.m. on August 2, 2005. He did not report as directed. The record also shows that Mr. Green became involved in an incident, arising out of this direction, with a fellow co-worker and the supervisor which gave the direction. Mr. Green was described as acting in a confrontational manner towards his fellow workers and supervisor, which included the use of abusive, profane language, and making statements which were perceived by these individuals as threatening to their person, whether intended to be or not. The accounts of the supervisor and co-worker of the incident is [sic] credited. Accordingly, I find that Mr. Green engaged in the charged conduct.

After duly considering the record and the credible testimony therein, and also taking into consideration that Mr. Green is a 23 year employee for whom the type of conduct charged does not appear to have previously been a problem during his career, it is the decision of the undersigned that Mr. Green shall receive twenty (20) days suspension without pay.

Green served his suspension, and returned to work at the Holland Tunnel. (Green Dep. 56:3-13.) On December 28, 2005[1], Green sent a 13 page document to various supervisors at the Holland Tunnel, the Port Authority Legal Department, a law firm, and the Equal Employment Opportunity Commission ("EEOC"). The document begins with a paragraph directed "To Whom It May Concern," which states:

I am sending this report to you to review and act according to your jurisdiction. In any case, I expect to hear from you as soon as possible, preferably within the following four business days after receiving these documents. Please be advised that this report is being sent to other P.A. offices, as well as my private attorney's office. If more information is needed feel free to contact me.

(Pinnock Cert., Exh. B.)

In the body of the document, which is entitled "Incident Report," Green wrote that beginning in the summer of 2004, Martin engaged in "flirtatious behavior" with him and when he denied her advances, she began singling him out with undesirable work assignments. (*Id.*) Green also asserted that specific supervisors, along with other Port Authority employees, were members of an "illegal lottery pool" that "operate[s] as a clique." (*Id.*) Green complains that

---

[1] In his Opposition to Defendants' Motion for Summary Judgment, plaintiff incorrectly states that this document was dated August 28, 2005. It is clear, however, from the signature page that it was dated December 28, 2005.

Martin collaborated with others to obtain an unfair result from the October disciplinary hearing. (*Id.*)  Green cites to specific instances occurring during 2005, including the August 2nd incident that had led to the hearing and the suspension.  (*Id.*)  Page 12 of Green's document states that the incidents he complains of violate "The Guide to Port Authority Ethical Standards," in particular Chapter 2, Ethical Standards, and the section subtitled Discrimination and Harassment, which he quotes in full.

On February 10, 2006, the Manager of the Office of Equal Opportunity within the Port Authority issued a Memorandum directed to Green:

> This memo serves to inform you that the Office of Equal Opportunity has completed its investigation into your allegations of inappropriate and possibly discriminating conduct directed towards you by your Supervisor, Lela Martin consisting of flirtation and retaliation.
>
> Please be advised that this Office take allegations of inappropriate conduct seriously and approach each investigation with equal force.  Similarly, the Office of Equal Opportunity makes impartial determinations based on the facts or credible information as presented by all necessary parties.  With that said, the facts uncovered as part of my investigation did not reveal any pattern of conduct or practices that would rise to the level of either a violation of federal employment law or Port Authority policies or Rules and Regulations.
>
> As a result, I am unable to conclude that there has been any violation of Title VII of the Civil Rights Act of 1964 to support your claim and therefore, the Office of Equal Opportunity has closed your case on matters relevant to this office.

(McGahee Cert., Exh. 7 at 1.)

During calendar year 2006, employment-related documents went back and forth between Green and management, and the record is replete with them.  Some relate to the charges Green made in his December 28, 2005 Incident Report, and some arise out of events that took place during 2006.

On June 23, 2006, an incident occurred between Green and a Port Authority supervisor, Nicholas Mircovich.  (Green Dep. 63:23-64:2.)  Green was driving a Port Authority vehicle

12

through the Holland Tunnel after finishing an assignment.  (*Id.* at 64:16-19.)  As he stepped on the brake at an intersection, Green said his "seat just came forward, . . . [and] slammed" him against the steering wheel.  (*Id.* at 64:20-24.)  Green said he felt dazed, but was able to radio the Port Authority office that his seat had malfunctioned and that he could not move the vehicle from the curb at the side of the road.  (*Id.* at 65:1-7.)  Green was told that two Port Authority Bridge and Tunnel supervisors would arrive soon.  (*Id.*)  Ten minutes later, Martin and Mircovich arrived.  (*Id.*)  According to Green, although he told them he was injured, Mircovich ordered him to get out of the car, and inspected the car seat and said it was operational.  (*Id.* at 65:10-13.)  Green testified that Mircovich acted "as if I made up the whole thing."  (*Id.* at 66:3-7.)  Mircovich testified at his deposition that Green was "quite angry," and was "yelling to take the vehicle out of service," whereas Green stated that he was "upset" but he only "raised [his] voice to be heard."  (Mircovich Dep. 23:12-17; Green Dep. 69:3-13.)  Mircovich ordered another Port Authority TBA, Ed Wendour, to come to the scene and transport Green to Port Authority medical services.  (Green Dep. 66:3-7.)  Green was given a muscle relaxant and pain medication.  (*Id.* at 66:24-67:5.)  After the incident, Mircovich wrote up Green for "rude and aggressive behavior" toward a supervisor.  (Mircovich Dep. 33:25-34:19.)

After he was treated at Port Authority medical, Green requested that he have a week of medical leave.  (Green Dep. 66:24-67:5.)  When he learned that the vehicle he had operated was still in use, by his own account he became "very upset," and demanded that a police report be filed.  (*Id.* at 67:18-68:4.)  Mircovich called Port Authority police.  (Mircovich Dep. 31:3-32:13.)  In his deposition, Green stated that he hyperventilated from the confrontation with Mircovich and the police.  (Green Dep. 70:4-6.)

On July 24, 2006, Robert Eadicicco, the general manager of the Holland Tunnel, formally requested that an evaluation be conducted on Green based on the foregoing incidents and because Green "continue[d] to stare or glare menacingly and attempt[ed] to intimidate staff by standing over them at their work stations." (McGahee Cert., Exh. 29 at 1.) Eadicicco wrote on the request form that "[m]any of the staff have expressed hesitance to respond with him on calls for fear of his instability." (*Id.*)

On November 13, 2006, Green sent a document alleging illegal gambling by Port Authority employees and sexual discrimination by Martin to Ed Schorno, Art Cifelli, and Daryl Buchbinder. (McGahee Cert., Exh. 8 at 1.) The record is unclear about the identities of these individuals.

On November 16, 2006, Green filed complaints with the New Jersey Division on Civil Rights ("NJ DCR") and the EEOC, alleging that certain Port Authority employees, including Martin, discriminated against him. (*Id.* at 74:7-20.) On April 30, 2007, the EEOC responded, on behalf of itself and the NJ DCR, with a determination that

> based upon its investigation, the EEOC is unable to conclude that the information obtained established violations of statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issue that might be construed as having been raised by this charge.

(McGahee Cert., Exh. 6.)

On December 18, 2006, Anthony Carvagno, the operations manager at the Holland Tunnel, sent Green a memorandum titled "Gambling Allegations." The document states:

> On Monday December 18th of this year STO L. Price and myself met with you in the General Managers [sic] Office to discuss the gambling allegations which you had recently forwarded to the Chief of Staff, and which you had previously submitted to various staff in the Agency earlier this year. In March of this year we met with the General Manager regarding your request for a transfer when this specific subject had come up in the discussion. After discussing with the Port Authority Law Department, Mr. Eadicicco had reaffirmed to you then that the

purchase of lottery tickets and employees participating in a lottery pools [sic] were not illegal, and playing lottery does not fall under the category of gambling. I have once again consulted with the Law Department regarding your most recent submittals to Mr. Shorno, and they have affirmed their original decision.

The purchase of lottery tickets in the State of New York or New Jersey is legal. Furthermore it is not unethical nor is it considered gambling or a violation of the general rules and regulations for employees to participate in lottery pools.  The purchase of lottery tickets while an employee is on his/her meal break does not violate the general rules and regulations and is not considered gambling. (McGahee Cert., Exh. 9 at 1.)

Between September 2006 and January 2007, Elizabeth Gill, who had earlier presided over Green's suspension hearing, conducted four days of hearings arising out of the charges served on Green in July 2006 relating to the incident between him and Mircovich.  Gill issued two written Opinions, which are identical in the Opinion section and differ in the Award, *see* infra.  According to the Opinion, on each day of the proceedings, Port Authority attorneys and attorneys for Transit Workers Union-Local 1400, representing Green, offered evidence including documents and compact disc audio recordings, conducted direct and cross examination of witnesses, and submitted post-hearing briefs.  (Original Op., McGahee Cert., Exh. 30 at 3-4.)

Gill set forth a Background section, indicating the parties were not in dispute about the basic facts.  She summarized in depth the position of the Port Authority and the union.  (*Id.* at 5–8.)  The Discussion portion of the Opinion runs several pages, and includes an assessment of Green's December 28, 2005 Incident Report, which was marked Exhibit D at the proceedings. (*Id.*)  Gill wrote,

> With respect to Exhibit D, [] the content therein details Respondent Green's account of a number of on-the-job situations which he feels, as to him, were not properly handled by supervisory staff; especially by Supervisor Martin, with whom he seems to differ on just about any job assignment or matter.

> Exhibit D does, however, permit the undersigned to conclude that Respondent Green does not presently, for the most part, enjoy good professional

15

relationships and interactions with many of his co-workers and supervisory staff at the Holland Tunnel facility. By all accounts, Respondent, a self-described "non-clique person," who was a satisfactory employee until about two years ago, seems to have, at least up to that point, maintained on-the-job professional relationships within the Holland Tunnel work environment. Clearly, things have changed within that work environment. Tension, and perhaps even some feelings of hostility, appears to be present there now. To that end, the Port authority must consider that it has a duty to provide all employees with a safe and hostile free environment in which to work.

(*Id.* at 14.)

Gill rejected Green's claim that the disciplinary proceedings before her in 2005 and 2006 had a basis in retaliation, stating that none of his exhibits or testimony "establishes a basis for the charges. Moreover, the record before me contains no corroborative evidence for any of the events detailed in the exhibits." (*Id.* at 14–15.)

In her first Opinion and Award, issued on May 31, 2007, apparently consistent with her observations about the strained work environment she alluded to, Gill directed the Port Authority to transfer Green to another facility "as expeditiously as possible." (*Id.* at 16.) After the Port Authority objected that the award exceeded Gill's authority, she amended it to a suspension of 35 days. (Modified Op., McGahee Cert., Exh. 16 at 15.) Green did not exercise his right to appeal, but made a formal request to be transferred to the Lincoln Tunnel, which the Port Authority agreed to do. (Green Dep. 113:13-21.) In October 2007, Green began working there and, it appears from the record, continues to be so employed. (*Id.* at 98:3-8, 12:11-13:2.)

Before his transfer to the Lincoln Tunnel, an altercation occurred between Green and his co-worker, Tommy Smith in June 2007. (*Id.* at 92:1-7.) Green testified that during his breakfast in the Port Authority cafeteria, Smith approached him and demanded in a "loud aggressive tone" that Green remove his helmet and bag from the cafeteria table. (*Id.* at 92:7-12.) Green responded that he would wipe down the table when he finished eating. (*Id.* at 92:13-15.)

16

According to Green, for the next 10 or 15 minutes, Smith continued his demands.  (*Id.* at 92:15-19.)  Green stated that he put a tape recorder on the table and asked Smith to start his remarks over.  (*Id.* at 93:3-8.)  According to Green, Smith turned and left the room, only to return with his breakfast, manager Laurie Price, and two maintenance supervisors.  (*Id.* at 93:4-17.)  Green stated that after the other members of the group left the cafeteria, Smith returned, demanding that he remove the bags from the table and asked him, "What's up with the tape recorder?"  (*Id.* at 93:22-94:1).  Green testified that he called the Port Authority police, but the police desk person informed him that no one could respond.  (*Id.* at 94:5-13.)  It is unclear from the record what transpired next; however, Green testified that he hyperventilated later that day and went to the hospital, and that he was placed on sick leave for a week due to stress.  (*Id.* at 94:19-22.)

According to Green, at some point after his altercation with Smith, he began seeking help from a mental health professional, Clara Caines, who treated him for approximately six or seven months.  (*Id.* at 95:5-96:7.)  Caines taught him breathing exercises to treat his anxiety and Green attended group therapy sessions.  (*Id.* at 96:4-96:13.)  Caines also referred him to psychiatric nurse Debra Drum in order to help him deal with his trouble sleeping, stress, and anxiety.  (*Id.* at 96:20-25.)  Green saw Drum for approximately two months.  (*Id.*)

On August 13, 2007, Green filed the instant complaint in the Southern District of New York charging that the Port Authority and the individual defendants "retaliated against him and created a hostile work environment with regard to . . . his employment for filing charges of sexual harassment on a supervisor in violation of Title VII of the Civil Rights Act of 1964 . . . and for filing a complaint about gambling on the job." (Compl. ¶ 1.) The case was transferred to the District Court of New Jersey on August 13, 2007 by order of United States District Judge Victor Marrero pursuant to a 28 U.S.C. § 1404(a) transfer motion [D.E. 1.].

### III.   Jurisdiction

The Court has federal question jurisdiction because Green's complaint raises issues of federal law under Title VII and alleges employment discrimination in violation of the statute.  28 U.S.C. §§ 1331; 42 U.S.C. § 2000e-2.  Supplemental jurisdiction exists over his state-law claims.  28 U.S.C. § 1367(a).  Venue is proper as well, since all acts giving rise to the Green's claims occurred within this district.  28 U.S.C. § 1391(b).

### IV.   Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000).

On this summary judgment motion, the record consists of the complete deposition transcripts of Frank Green, Cotea Jones, and Lela Martin, as well as excerpts of the depositions of Nicholas Mircovich, Robert Eadicicco, Laurie Price, and Anthony Carvagno.  The parties have also submitted Port Authority sexual harassment policy bulletins and guidelines, multiple Port Authority disciplinary reports on Green, two Arbitrator's Opinions on Green's disciplinary proceedings, his EEOC complaint, an EEOC "right to sue letter" addressed to Green, internal memoranda about Green prepared by Port Authority supervisors, Green's submission to Port Authority administrators, and a Port Authority Office of Equal Employment Opportunity document detailing its findings on Green's allegations.

## V.  Discussion

Title VII prohibits employers from discriminating on the basis of race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a).  A plaintiff may bring suit against an employer under Title VII's anti-discrimination provision, § 2000e-2(a), or its anti-retaliation provision, § 2000e-3(a).

It appears from the complaint that Green alleges that the Port Authority violated Title VII in three ways: (1) making him endure a hostile work environment based on his sex; (2) retaliating against him for filing sexual harassment complaints; and (3) retaliating against him for filing a complaint to Port Authority management about his co-workers' participation in what he believed to be an illegal lottery pool.

### A.  Hostile Work Environment

If an employee endures a "workplace [that] is permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," he may bring a successful hostile work environment claim.  *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal citations and quotations omitted).  These conditions must be affected by a type of discrimination prohibited by Title VII.  *See Jensen v. Potter*, 435 F.3d 444, 449–50 (3d Cir. 2006), *overruling on other grounds recognized by Moore v. City of Philadelphia*, 461 F.3d 331, 340 (3d Cir. 2006) ("Many may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief.").  For Green to establish his *gender*-based hostile work environment claim, he must demonstrate that: (1) he suffered intentional discrimination because of his sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the

19

discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) respondeat superior liability exists. *Huston v. Procter & Gamble Paper Products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). Moreover, "[a] plaintiff may [] establish that an employer violated Title VII by proving that sexual harassment created [the] hostile work environment." *Id.*

Courts have examined workplace conditions and found that they may create a hostile environment when sexual harassment rises to a sufficiently "severe or pervasive" level. For example, the Supreme Court found that the workplace conditions of lifeguard Beth Ann Faragher constituted a gender-based hostile work environment in *Faragher v. Boca Raton*, 24 U.S. 775, 810 (1998). The Court observed that during her five-year employment, one of Faragher's supervisors "repeatedly touched the bodies of female employees without invitation"; "put his arm around Faragher, with his hand on her buttocks"; made contact with another female lifeguard "in a motion of sexual simulation"; uttered "crudely demeaning references to women generally"; and once, during a job interview with a woman he hired as a lifeguard, stated that female lifeguards had sex with their male counterparts and asked whether she would do the same. *Id.* at 782.

Likewise, in *Andreoli v. Gates*, a case where only respondeat superior liability was disputed, the Third Circuit recounted plaintiff Janice Andreoli's evidence about the "severe or pervasive" discrimination she was subjected to. 482 F.3d 641, 644, n.3 (3d Cir. 2007). During her employment, one of Andreoli's co-workers used comments like "big jugs"; made reference to "fondling female coworkers; and critiqued Andreoli's clothes and appearance. He told Andreoli what he would do to her "if he ever had the opportunity." *Id.* Once, "[her co-worker] put his hand between Andreoli's legs and refused to remove it until Andreoli began screaming and dug her fingernails into [his] arm." *Id.*

20

The foregoing examples are specific and objectively and unequivocally objectionable by any standards.  The record here, which has been set forth in this opinion in some detail, simply does not approach actionable conduct on the part of Martin or others.  Viewed in the best light for Green, his evidence does not establish discriminatory conduct on Martin's part that created a hostile work environment.  To begin with, Green testified at some length in his deposition about the allegedly sexually provocative clothes Martin wore during her interactions with him.  The Court has quoted in full his description of her manner of dress and his speculation as to the motives behind it.  Green had full opportunity to describe what Martin wore in her office, and he took advantage.  Nonetheless, his  testimony fails to support his cause, because Green admitted that whenever he was in her office, Martin was wearing the same clothing that she wore throughout the rest of the day in full view of any and all other employees.  Where Green suggested that she left off a jacket or a sweater, presumably in order to be more enticing to him, his testimony demonstrates mere speculation on his part:

> Q:  And you are surmising that [removing a jacket] might not have anything to do with the temperature in the room or a comfort situation, you have concluded that that was because she was attempting to reveal herself to you; is that your testimony?
> A:  Yes.
> Q:  Did you ever see Ms. Martin walk outside of her office without a sweater or a jacket.
> A:  Yes.  I mean she had worn other clothing that, you know, everybody dresses different every day but.

(Green Dep. 44:25-45:10.)

This testimony is not evidence of an abusive environment based on inappropriate, provocative attire that would offend the reasonable employee similarly situated.  Rather it only reflects what Green surmised Martin was doing, his perception and speculation that she was deliberately dressed a certain way because he was there.  The objective fact remains that she did not wear her

jacket or sweater in her own office.  There are no facts alleged that she was dressed differently –
i.e., more buttoned-up -- when people other than Green were in her office.  Worse for Green's
case, he describes her as dressed the same way outside of her office as well.

As for Martin's conduct, just about every incident he complains of, Martin agreed
occurred.  The difference is how he interprets their interactions, not whether their interactions
happened.  Taking each incident in the very best light for him, Green may have established that
Martin flirted with him during the summer of 2004, rather suddenly evincing an interest by
complimenting him on his clothes and hair; by recalling having seen him at a bar; and, during the
one incident of physical proximity he testified about, being close enough to him that they saw
"eye to eye" after she remarked that he was likely to be cold because of what he was wearing.[2]
Courts require more severe or pervasive misconduct than this – objectively, Martin's actions are
not misconduct at all.

And this is important, because under the fourth prong of the hostile work environment
test, courts must consider whether the alleged misconduct "would detrimentally affect a
reasonable person of the same sex in that position."  *Huston v. Procter & Gamble Paper
Products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (emphasis added).  As the Supreme Court
opined, "We have always regarded [the objective analysis] requirement as crucial, and as
sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace –
such as . . . intersexual flirtation – for discriminatory conditions of employment."  *Oncale v.
Sundowner Offshore Services, Inc.* 523 U.S. 75, 81 (1998) (internal quotations omitted).  The
Court concludes that Martin's comments and actions are, at most, "intersexual flirting" that

---

[2]         This incident was described a second time when Green's attorney's questioned him at his deposition,
asking him if he was "close enough to kiss" Martin, whereupon Green responded "yeah."  (Green Dep. at 106:10-
22.)

would not be considered by the reasonable male employee as severe and abusive.  Moreover, Green was specifically asked, and denied that Martin made overt sexual advances or that he specifically rejected conduct that he deemed to be sexually aggressive on her part.[3]

The Third Circuit recognizes that a claim combining allegations of sexual harassment and subsequent retaliation may support a claim for hostile work environment.  *See Jensen* 435 F.3d at 449–50; *see also Clegg v. Falcone*, 174 F. Appx. 18 (3d Cir. 2006) ("[Plaintiff] has presented sufficient evidence to establish a genuine issue of material fact as to whether, considering the post-reporting conduct in conjunction with the allegations of sexual harassment that pre-dated [her] complaint to management, [she] was exposed to a hostile work environment.")  For such a claim, the "usual hostile work environment framework applies."  *Id.*  Thus, a plaintiff must tie any alleged retaliation in a hostile work environment claim to the underlying discriminatory basis—here, gender-based discrimination.  *Id.*  Courts employ a "sufficiently demanding" standard to decide whether these workplace conditions create a hostile environment "to ensure that Title VII does not become a 'general civility' code."  *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998).  Hence, "simple teasing, offhand comments, and isolated incidents (unless extremely

---

[3] At Green's deposition, he was asked whether Martin ever openly made advances toward him.
> Q:  Is it also true that she never said anything to you in a direct manner, such that she was interested in going out with you or having a relationship with you?  You have concluded based upon her actions that she made advances towards you; would that be fair to say?
> A: Yes.  She has made advances towards me.  But she didn't come out directly and say that she waned [sic] to be with me, that, no.

(Green Dep. 50:22-51-5.)

When questioned about whether he ever rejected Martin, Green testified:
> A:  I didn't say, leave me alone.  I basically walked away from her.  I said, I have work to do, and I walked away from her.
> Q:  You never said Lela, I'm not interested in you, leave me alone.  You never said anything that direct?
> A:  No.  I never said anything direct like that.

(*Id.* at 50:11-21.)

serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 788 (citation and internal quotation marks omitted).

Green testified that after his first 20 day suspension, and approximately one year after Martin's alleged sexual advances during summer 2004, he started keeping a diary to detail what he perceived to be her unfair treatment of him.  (*Id.* at 58:11-25.)  He said, "After Lela Martin realized I wasn't interested in her, [] she started using retaliatory type of behavior towards me, which directly affected my work environment . . . [and] just made my work day miserable."  (*Id.* at 58:14-20.)  But when he testified at his deposition, Green failed to describe what Martin's "retaliatory type of behavior" entailed.  Martin's direct supervisor, Cotea Jones, testified that Green's *only* complaint about Martin, which prompted him twice to seek intervention from Jones, was that she watched him on camera during his details. (Green Dep. 89:2-12; Jones Dep. 17:9-21.)  According to Jones, Green never mentioned Martin's sexual harassment or his belief about her motivations.  And although Green disagrees, claiming he indicated to Jones that Martin was retaliating because he spurned her, the absence of specific examples of "retaliatory type behavior" is significant.

What does exist is Green's complaint that Martin's close supervision and her efforts to radio him numerous times per day amounted to retaliatory harassment, but it is well-settled that "'being closely supervised or 'watched' does not constitute an adverse employment action that can support a claim under Title VII,'" *McKinnon v. Gonzalez*, 2009 WL 2338381, at *9 (D.N.J. July 24, 2009) (*quoting Lester v. Natsios*, 290 F.Supp.2d 11, 30 (D.D.C.2003)), and that "'having one's work micromanaged may be unpleasant but does not . . . [give rise to] a hostile environment claim.'" *Id.* (*quoting Haley v. Alliance Compressor LLC*, 391 F.3d 644, 652 (5th Cir. 2004) (citation omitted)).  Green's complaints that Martin directed him to perform tasks he

24

felt were beneath him are not of a level to establish a cognizable claim that she was reacting to his disinterest in her, or even his complaints about her.  They reflect more precisely that she told him, as his supervisor, to perform work assignments he may not have liked.  But he does not establish these tasks were not within his job description – the most he states is that there were others who could have performed them instead.

In addition to his interactions with Martin, Green highlights three allegedly retaliatory actions by other Port Authority employees to show the purported hostile work environment:  (1) the August 2, 2005 altercation between himself and Monde in the cafeteria; (2) the June 23, 2006 incident between himself and Mircovich in the Holland Tunnel; and (3) the argument between himself and Smith regarding the cafeteria table.  Green's reliance on these incidents to show a Title VII claim of hostile work environment is misplaced.

As stated, to establish a hostile work environment, Green must show that the retaliatory conduct he received "was motivated by gender."  *Clegg*, 174 F. Appx. at 25. Green fails to link up his allegations about Martin, and the fights he had with Mircovich, Monde, and Smith.  As such, the three incidents are not demonstrably tied to a *gender*-based animus.

The Court turns finally to Green's testimony that another supervisor, Cotea Jones, remarked, "I know that Lela Martin likes you [so] why don't you do her and get it over with?" (Green Dep. 89:20-24.)  The Third Circuit has long been clear that both the *frequency* and the *gravity* of incidents constituting alleged harassment must be established.  *Andrews v. City of Philadelphia,* 895 F. 2d 1469, 1484 (3d Cir. 1990).

> [A] decision regarding hostile work environment should be made viewing the totality of the circumstances . . . .  Particularly in the discrimination area, it is often difficult to determine the motivations of an action and any analysis is filled with pitfalls and ambiguities. A play cannot be understood on the basis of some of

its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario. *Id.*; *see also Abramson v. William Paterson College,* 260 F. 3d 265, 276 (3d Cir. 2001).

The Supreme Court has held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount" to a cognizable hostile work environment claim. *Faragher*, 524 U.S. at 788.  Assuming Jones made the statement attributed to her, at most she was making a teasing off-hand comment.  Green never alleges, or establishes by his testimony or otherwise, that Jones took action against him because he did not "do" Martin.  He testified she "laughed off" his complaints about Martin, but for this to be actionable, Green's complaints would have to have substance, and the Court finds otherwise.  Moreover, Green was complaining to Jones about Martin in front of Martin and possibly another employee.

As to the only, and therefore demonstrably isolated example of physical proximity between him and Martin, when Green testified at his lawyer's prompting that he and she were standing close enough to kiss each other, the incident at best amounts to an instant of sexual attention on Martin's part that never led anywhere.

Accordingly, the Court concludes that Green has failed to adduce evidence of gender-based discrimination and hostile-work environment based on gender-based discrimination and/or Martin's alleged retaliatory conduct because he did not return her claimed advances.[4]  After careful consideration of all of Green's allegations of sexual harassment and claims of gender-based retaliation, the Court finds that his proofs are so minimal that no reasonable fact-finder

---

[4]     The Court gives short shrift to Green's claims that the two disciplinary hearings constituted retaliation because Martin was somehow complicit in how the hearings were handled and the adverse outcomes.  Green did not appeal the arbitrator's findings or sanctions.  He seeks to advance her conclusions after the second hearing that "things have changed within [the] work environment," and that there existed "tension and perhaps even some feelings of hostility," as proof that he was the victim of a hostile work environment.  But this completely ignores the fact that the arbitrator issued sanctions *against Green*, which defeats any interpretation of her comments as a finding against the Port Authority.

could render a verdict in his favor.  Green's proofs do support what the arbitrator concluded:  he described "a number of on-the-job situations which he feels, as to him, were not properly handled by supervisory staff; especially by Supervisor Martin, with whom he seems to differ on just about any job assignment or matter."  The record shows that Green took Martin's actions as his supervisor very personally.  As he wrote after the August 2, 2005, incident when she wrote him up: "Over the twenty years that I have been employed by the Port Authority, I have never before encountered any situation in which neither my job performance nor my behavior has been subjected to any scrutiny by any other supervisor."  Green bristled, complained, and ultimately sued in response to how Martin supervised him.  But the record does not establish that Martin behaved in an abusive manner (to the contrary, Green does not dispute that he was, on more than one occasion, well out of line), or that Martin was acting outside her authority as his supervisor.  From the objective evidence, as opposed to Green's perceptions, Martin's "offense" appears to be that she *was* his supervisor, and that she monitored his conduct closely and wrote him up after he admittedly defied her instructions and angrily confronted her and other supervisors.

As such, defendants' motion for summary judgment in their favor on Green's sexual harassment claim is granted.

### B.  Retaliation

Section 2000e-3(a) of Title VII sets forth the statute's anti-retaliation provision as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

This provision seeks to prevent employer interference with an employee's "unfettered access" to the statute's remedial mechanisms by prohibiting employer actions that may deter victims of discrimination from complaining to the EEOC, courts, or their employers. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). Title VII protects those who oppose, or participate in proceedings against discrimination on the basis of race, color, religion, sex or national origin. *See Clark County v. Breeden*, 532 U.S. 268, 271 (2001) (finding that an employee must hold an objectively reasonable belief, in good faith, that the activity he opposes is unlawful under Title VII). It appears that Green makes two claims under § 2000e-3(a): (1) defendants retaliated against him for his allegation that his co-workers engaged in an illegal lottery pool; and (2) defendants retaliated against him for complaining of sexual harassment.

To establish a prima facie case for retaliation, Green must establish that: (1) he engaged in protected employment activity; (2) his employer engaged in adverse employment actions; and (3) there is a causal link between the adverse employment action and the protected activity. *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006).

Under Title VII, an employee engages in "protected activity" when he "participates in" certain Title VII proceedings against discrimination made unlawful by Title VII or "opposes" discrimination. *Slagle*, 435 F.3d at 266. As a consequence, Green's claim that he suffered retaliation as a result of his charges about on-site gambling can be swiftly disposed of. The protections under Title VII are directed toward employee actions opposing discrimination on the basis of race, color, religion, sex, or national origin. *See* 42 § 2000e-3(a); *see also Clark County v. Breeden*, 532 U.S. 268, 271 (2001) (rejecting retaliation claim where "[n]o reasonable person could have believed that" the underlying incident complained about "violated Title VII's standard" for unlawful discrimination). A prima facie case under the anti-retaliation provision of

28

Title VII requires a showing that the employee was engaged in protected activity.  The anti-gambling charge does not constitute protected activity and, as such, this aspect of Green's case fails and the claims of retaliatory treatment on that basis are dismissed.

By contrast, Green's complaints of sexual harassment, an act made unlawful by Title VII, meet the first prong of the prima facie test.  What is not clear is *when* Green first became protected under Title VII.  The record shows that he filed a sexual harassment complaint with the EEOC on November 16, 2006.  (Green Dep. 74:7-20.)  Arguably, Green first engaged in "protected activity" even earlier, when he "opposed" sexual harassment by sending the December 28, 2005 13 page document to various supervisors at the Holland Tunnel, the Port Authority Legal Department, a law firm then representing him, and the EEOC.  *See Robinson v. Southeastern Pennsylvania Transp. Authority, Red Arrow Div.*, 982 F.2d 892, 896, n.5 (3d Cir. 1993) (finding that § 2000e-3(a)'s "opposition" clause was invoked when plaintiff wrote to his Congressmen and stated that one of his supervisors "seems bent on harassing nothing but black employees"); *see also Slagle*, 435 F.3d at 266 (holding that "protected activity" exists once an employee "initiates proceedings against" or "*opposes*" certain Title VII proceedings against discrimination made unlawful by Title VII).[5]  Thus, because an employee is only "entitled to the broad protections" against retaliation once he engages in "protected activity," Green incorrectly points to certain incidents occurring *before* December 28, 2005 to support his retaliation claim.  *Id.* at 268.   Green's examples of purported Port Authority misconduct occurring before

---

[5]     Although Green references his December 28, 2005 letter in his EEOC filing, he does not allege in the complaint for this action that the Port Authority retaliated against him in response to that letter.  Instead, in his complaint, Green states that "defendants retaliated against him . . . for *filing charges* of sexual harassment on a supervisor."  (Compl. ¶ 1.) (Emphasis added.)  Nevertheless, the Court will view the earlier of the two actions as when Green first invoked Title VII's protections against retaliation.

December 28, 2005 necessarily do not meet the first requirement of the Third Circuit's three-prong retaliation test.

The Supreme Court has held that a retaliation claim requires a plaintiff to show that "adverse employment actions" taken by an employer would be considered "materially adverse" by a reasonable employee, and that the actions "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Railway Company. v. White*, 548 U.S. 53, 68 (2006). The Supreme Court emphasized that the adversity must be material so as to distinguish between harms to the employee that are significant and those that are "petty slights, minor annoyances, and simple lack of good manners." *Id.*

Five incidents arguably occurred after December 28, 2005, which would qualify them temporally as demonstrating retaliation: (1) the allegedly undesirable work assignments Martin gave Green; (2) the June 23, 2006 incident in the Holland Tunnel; (3) the May 2007 arbitration hearing held in connection with that incident; (4) Eadicicco's written request that Green be evaluated by doctors; and (5) Smith's actions in the cafeteria.

Green alleges in his complaint that Martin took "adverse employment actions" against him by creating the TBA's work schedule "to benefit other coworkers and to agitate [him]" and by assigning him to wash vehicles, even when his post did not require the duty. (Compl. ¶ 17). As the Supreme Court has opined, "a reassignment of duties [could] . . . dissuade a reasonable employee from engaging in Title VII-protected conduct" and be considered an "adverse employment action." *Burlington Northern*, 548 U.S. at 70–71.

Next, Green testified that the June 23, 2006 incident in the Holland Tunnel between Mircovich and himself occurred "due to the fact that I filed a report against []Martin on

30

December 28." (Green Dep. 72:7-14.)  Although, the altercation between Green and Mircovich

on its own may not qualify, Mircovich's decision to file disciplinary charges against Green for

insubordination and "rude and aggressive behavior" toward a supervisor (Mircovich Dep. 33:25-

34:19), falls within the ambit of the second prong.

     As for Green's contention that Robert Eadicicco's written request that he be subjected to

a doctor's evaluation arises to a "materially adverse" employment action, the Court notes that a

factfinder could determine that the mental health evaluation arguably meets the level of adversity

required of the retaliation test's second prong.

     But Green's assertion that the Port Authority engaged in an adverse employment action

in the form of his disciplinary hearing on May 31, 2007 is without merit.  Undermining this

contention is the fact that Elizabeth Gill, the independent arbitrator who ultimately upheld his

disciplinary charge, *was not* a Port Authority employee.  Rather, she was an independent party

assigned the task of determining the validity of the disciplinary charge against Green and what, if

any, disciplinary actions should have been taken.  (*See* Original Op., McGahee Cert., Exh. 30 at

1.)

     Under Title VII jurisprudence, Green bears the burden of adducing facts leading to an

inference that the second prong of the retaliation test is met, i.e., an adverse employment action

was taken by the *employer*.  *See Moore*, 461 F.3d at 340–41.  Here, Green has pointed to no

evidence indicating that the disciplinary hearing itself or Gill's final decision to give him a 35-

day suspension constituted an adverse employment decision made by the Port Authority.  Rather,

Green was represented by counsel and afforded adequate procedural mechanisms to advance his

theory of retaliation before a neutral decision-maker.  For these reasons, the result of Gill's

decision is not germane to any analysis of retaliation by the Port Authority.

Green also argues that Tommy Smith's actions in the Port Authority cafeteria are adverse employment decisions. Bearing in mind that courts applying this framework distinguish between material adversity and harms that are "petty slights, minor annoyances, and simple lack of good manners," the Court finds Smith's conduct is more properly classified as a "simple lack of good manners" rather than a materially adverse employment action, and this incident also fails to meet the test's second prong.

But the analysis must go further.

To complete the requisite showing for a prima facie case of retaliation, Green must meet the test's final prong by showing that a causal link exists between the adverse employment actions and the Title VII-protected activity. *Moore*, 461 F.3d at 341. The third element "identif[ies] what harassment, if any, a reasonable jury could link to a retaliatory animus." *Jensen v. Potter*, 435 F.3d 444, 449–50 (3d Cir. 2006), *overruling on other grounds recognized by Moore v. City of Philadelphia*, 461 F.3d 331, 340 (3d Cir. 2006)). In determining whether conduct was retaliatory, the Third Circuit "tend[s] to focus on two factors: (1) the 'temporal proximity' between the protected activity and the alleged discrimination and (2) the existence of 'a pattern of antagonism in the intervening period.'" *Id.* at 450 (*citing Abramson v. William Paterson College*, 260 F.3d at 288. Temporal proximity alone may raise the requisite inference when it is "unusually suggestive of retaliatory motive." *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) ("[Plaintiff] demonstrated the causal link between the two by the circumstance that the discharge followed rapidly, *only two days later*, upon [defendant's] receipt of notice of [plaintiff's] EEOC claim") (emphasis added); *see also Clark County School Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (for mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action to be sufficient evidence of

causality, the temporal proximity must be "very close"). Alternatively, the Court may also look to the intervening period for other evidence of retaliatory animus, *Jensen*, 435 F.3d at 450, for example, where "the employer gave inconsistent reasons for [the adverse action]." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279–81 (3d Cir. 2000).

Examining the record evidence here, Green asserted in his complaint that he objected to Martin's unfair assignments "during the period of July 2004 through September 2004." This date range is the only time period in the record ascribed to Martin's unfair work assignments to Green, and it predates the alleged sexual interest on Martin's part. (Compl. ¶ 18.) There is insufficient testimonial or documentary evidence to establish that Martin gave Green less desirable work details at any point after December 28, 2005. Green fails to link up, as he must, the shift assignments Martin gave him to his protected conduct.

Green's evidence also fails to establish that Mircovich's disciplinary action or Eadiccio's mental health evaluation request came about due to retaliatory animus. As stated, Green first notified the Port Authority of his opposition to Martin's sexual misconduct on December 28, 2005. Mircovich's alleged retaliation took place on June 23, 2006, and Eadiccio's on July 24, 2006, nearly six and seven months later. Lapses of six and seven months do not constitute a "very close" temporal proximity. *See, e.g., Jalil*, 873 F.2d at 708 (finding employee's termination two days after employer learned of EEOC claim sufficiently close in time to infer causal link); *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."). Further, Green has not adduced evidence of retaliatory animus tied to any actions by Mircovich, Eadiccio, *or*

33

*any other defendant* in the intervening period.  Finally, Mircovich gave rational, consistent reasons for filing his disciplinary action against Green for insubordination and Eadiccio did the same to support his request for a mental health evaluation. Green offers no evidence that their justifications are pretextual.  Accordingly, Green has failed to establish the requisite causal link between any adverse employment decisions and his protected activity, and as a result his retaliation claim fails.

### C.  Timeliness of EEOC Claims

Defendants also raise a procedural argument that Green's November 16, 2006 EEOC action alleging discrimination and retaliation by Martin and the Port Authority was time-barred by 42 U.S.C. § 2000e-5(e).  The Court need not address this procedural argument, due to its substantive disposition of the matter.

### D.  State Law Claims

Section 28 U.S.C. 1367(a) of the Judicial Improvements Act of 1990 states that federal courts "shall have supplemental jurisdiction" over claims if they are "part of the same case or controversy" over which the court has original jurisdiction.  Subsection (c), of the statute provides that a district court may, in its discretion, decline to exercise jurisdiction if it "has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c).  The Third Circuit has recently observed, "In most cases, pendent state law claims should be dismissed without prejudice where the claim over which the district court has original jurisdiction is dismissed before trial." *Cindrich v. Fisher*, 2009 WL 1950073, at *6 (3d. Cir. July 8, 2009).  Here, because all Title VII claims are subject to summary judgment on behalf of defendants, the Court will not exercise jurisdiction over the remaining state law claims for intentional infliction of emotional

distress and negligent infliction of emotional distress, and they are dismissed against the Port Authority and each individual defendant are dismissed.

## VI.   Conclusion

For the foregoing reasons, summary judgment is granted in favor of defendants on Green's federal claims, and the complaint will be dismissed.   An appropriate order will be entered.


/s/ Katharine S. Hayden

Katharine S. Hayden, U.S.D.J.